# Exhibit E

LEXSEE 2005 U.S. DIST. LEXIS 2935

**ALICE ANDERSON, et al., Plaintiffs, v. CHARLES RAMSEY, et al., Defendants.**

**Civil Action No. 04-56 (GK/JMF)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2005 U.S. Dist. LEXIS 2935*

**March 1, 2005, Decided**

**DISPOSITION:** Plaintiff's motion for protective order granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For ALICE ANDERSON, BETTY BIBB, GWENDOLYN CAREY, DELPHINE FENNELL, JENNETTE MILLER, JUSTINE TOLSON, JERI BUTLER, CURTIS ADAMSON, Plaintiffs: Ted Justice Williams, Washington, DC; Phoebe Leslie Deak, Deats & Levy, P.C., Washington, DC.

For CHARLES RAMSEY, NOLA JOYCE, SHANNON COCKETT, DISTRICT OF COLUMBIA, A Municipal Corporation, Defendants: Holly Michelle Johnson, OFFICE OF CORPORATION COUNSEL, Washington, DC.

For IRA GROSSMAN, Defendant: William Louis Hennessy, BUCHANAN & HENNESSY, PA, LaPlata, MD.

**JUDGES:** JOHN M. FACCIOLA, UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** JOHN M. FACCIOLA

**OPINION:**

## MEMORANDUM OPINION

This case was referred to me for resolution of Plaintiffs' Motion for Protective Order ("Motion for P.O."). For the reasons stated below, plaintiff's motion will be granted.

## INTRODUCTION

Plaintiffs n1 are former employees of the Public Safety Communication Center ("PSCC") of the Metropolitan Police Department ("MPD"). Amended Complaint ("Amended Comp.") at 4. "PSCC is the arm of the D.C. Police Department responsible for planning and coordinating the delivery of emergency communication services and trauma care to residents, workers, and visitors of the District [*2] of Columbia." Id. at 7. On January 15, 2003, PSCC received notice of a fire in the Dupont Circle area. Id. at 8. Although a fire truck was dispatched to the area, one person died in the fire. Id. An investigation immediately ensued. Id.

> n1 Plaintiffs are Alice Anderson, Curtis Adamson, Betty Bibb, Jeri Butler, Gwendolyn Carey, Delphine Fennell, Jennette Miller and Justine Tolson.

Plaintiffs claim that at the time of the investigation, Police Chief Ramsey ("Ramsey") was in the process of negotiating a new contract with the District of Columbia. Id. at 8. Plaintiffs further claim that as a result of the public furor that arose following the incident, Ramsey attempted to orchestrate a coverup. Id. According to plaintiffs, Ramsey stated on public radio that he intended to fire some of the plaintiffs, while the investigation into the incident was ongoing, and conspired with several of his managers to intentionally or recklessly disregard the decisions from the administrative review process [*3] by terminating the employment of a number of the plaintiffs in retaliation for speaking publicly about the tragedy. Id. at 9.

Additionally, plaintiffs allege that the terminations were directed solely at African-Americans and that a Caucasian manager was not fired. Id. at 13-14. Plaintiffs claim that when they notified Ramsey that his decision was racially motivated, he subsequently fired a codefendant, Grossman, a Caucasian employee, to "disguise his partiality." Id. at 14. Finally, plaintiffs allege that Ramsey's previous employment decisions further demonstrate a pattern of racial motivation. Id.

Specifically, plaintiffs bring this action for 1) violation of their civil rights due to race discrimination, 2) violation of their constitutional rights under due process and free speech grounds, 3) violation of their contractual rights due to race discrimination under § *1981*, 4) retaliation, 5) violation of the D.C. *Whistle-blower Protection Act*, and 6) intentional infliction of emotional distress.

## DISCUSSION

### I. The Discovery Sought

Defendants served plaintiffs with certain document requests, including the following requests for financial and medical [*4] information:

> 3. All medical reports or document or copies thereof relative
>
> to the injuries, damages, and/or the effects thereof sustained to the plaintiff as a result of the incident(s) alleged in the complaint.
>
> 4. Any and all medical records, notes, bills, or other documents related to any psychological, psychiatric, or other professional treatment for mental suffering claimed by plaintiff as a result of the incidents alleged in the complaint.
>
> 8. Copies of all wage and income records relative to the plaintiff, including W-2 forms and State and Federal Income Tax Returns for the past ten (10) years.

Motion for P.O., Exhibit 1 at 4-6.

In resisting the protective order, the District places primary reliance on *In re Halkin, 194 U.S. App. D.C. 257, 598 F.2d 176, 188 (D.C. Cir. 1979)* for the assertion that there is a presumption in favor of public access to discovery materials that plaintiffs have not defeated. But, that case was specifically overruled in *Seattle Times Co. v. Rhinehart, 467 U.S. 20, 29, 81 L. Ed. 2d 17, 104 S. Ct. 2199 (1984)*. Any supposed presumption in favor of public access to discovery material, as articulated in Harkin [*5] , did not survive the Supreme Court's contrary conclusion in Seattle Times:

> Moreover, pretrial depositions and interrogatories are not public components of a civil trial. Such proceedings were not

open to the public at common law, *Gannett Co. v. DePasquale, 443 U.S. 368, 389, 99 S. Ct. 2898, 2910, 61 L. Ed. 2d 608 (1979)*, and, in general, they are conducted in private as a matter of modern practice. See *id., at 396, 99 S. Ct. , at 2913-2914* (BURGER, C.J., concurring); Marcus, Myth and Reality in Protective Order Litigation, *69 Cornell L.Rev. 1 (1983)*. Much of the information that surfaces during pretrial discovery may be unrelated, or only tangentially related, to the underlying cause of action. Therefore, restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information.

*Id. at 33.*

Hence, the district court unquestionably has discretion to seal documents produced in discovery that were not introduced into evidence and were not relied upon by the court in rendering a decision. *McConnell v. FEC, 251 F. Supp. 2d 919, 925 (D.D.C. 2003);* [*6] *Tavoulareas v. Washington Post Co., 111 F.R.D. 653, 658 (D.D.C. 1986).*

The exercise of that discretion is informed by the factors identified in *United States v. Hubbard, 650 F.2d 293, 313-22, 208 U.S. App. D.C. 399 ( D.C. Cir. 1980).* See *Willingham v. Ashcroft, 355 F. Supp. 2d 390, 2005 U.S. Dist. LEXIS 923, No. CIV.A.02-1972, 2005 WL 159456, at *1 (D.D.C. Jan. 25, 2005).* Those factors are: (1) the need for public access to the documents at issue; (2) the extent to which the public had access to the documents prior to the sealing order; (3) the fact that a party has objected to disclosure and the identity of that party; (4) the strength of the property and privacy interests involved; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced. *Hubbard, 650 F.2d at 324-25.*

Obviously, application of those factors here mandates the issuance of the protective order. The public has never had access to plaintiffs' medical and tax records and there is no need for it to have access now. Plaintiffs have objected to the disclosure of those documents and their objection is justified by the private, confidential nature of the information [*7] in those records. Finally, the documents are not in evidence but were produced in discovery and therefore any public interest in their disclosure is at its weakest. *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig., 101 F.R.D. 34, 41 (C.D. Calif. 1984)* (citing *Tavoulareas v.*

*Washington Post, 233 U.S. App. D.C. 126, 724 F.2d 1010, 1016 (D.C. Cir. 1984)).* Thus, the protective order should issue.

The District complains, however, that under the order plaintiffs have the right to designate any document as confidential and if it disagrees, the District must contest that designation, which would in turn lead to additional litigation. In my view, the problem the defendants present is more apparent than real. In *Tavoulareas v. Piro, 93 F.R.D. 24, 29 (D.D.C. 1981),* the court required a non-party to "simply note the confidentiality of certain documents produced, based upon a relatively cursory review of the contents or source of the documents," before turning them over. The court also stated:

> We recognize that flexibility will be required to accommodate the practical needs of the discovery process with the [*8] standards enunciated (in this case), particularly where the discovery embraces a large quantity of documents. It may be appropriate, for example, for a trial court (on a proper showing) to issue a blanket protective order covering all documents in a large-scale exchange of files without prejudice to raising the merits of the protective order as applied to particular documents at a later time. If a party wishes to disseminate a particular document, he might then inform the opposing party (precisely as plaintiffs have done here). At that point the burden would revert back to the party resisting dissemination to establish "good cause" as applied to the particular document(s), consistent with the standards enunciated in this opinion. This procedure is commonly used to preserve parties' right to assert claims of privilege with respect to particular documents in complex cases, while at the same time facilitating needed discovery.

*Id. at 29, 30 n.4.* This court finds *Tavoulareas'* reasoning to be persuasive. Paragraph 2 of the Proposed Protective Order imposes upon plaintiffs the initial obligation to indicate what documents they deem confidential. If defendants [*9] disagree, and the parties cannot settle the matter, plaintiffs must seek an order from this court. That is consistent with the procedure indicated in Tavoulareas and is no more burdensome upon the defendants than it has to be.

Defendants also claim that the protective order places too heavy a burden on the government because they must, *inter alia,* severely limit access to the documents, clear all individuals seeking to have access to the document, verify their understanding of the terms of the protective order, and return all documents following the conclusion of the case. Id. at 5. Given that the only persons having any interest in seeing the records are the lawyers defending it and their staffs, the burden imposed by the protective order upon the defendants is negligible.

Finally, defendants also complain that the protective order would create a Chinese fire-wall between the various government entities working on the case and that this is akin to seeking "to restrict the work product of opposing counsel within her own law firm." Opposition to Plaintiffs' Motion for Protective Order at 9.

They propose that, if the court were to impose a protective order to cover [*10] plaintiffs' medical and tax records, the protective order should not restrict the sharing of information between the various members of the Office of the Attorney General for the District of Columbia, regardless of which case, civil or administrative, they happen to be working on. Id. Curiously, although defendants then attempt to counter plaintiffs' argument that defendants' failure to articulate a legitimate need for the documents on the part of the attorneys working on the administrative claims is proof that no need exists, defendants do not then articulate any need for the documents at the administrative level. Id. at 10. Instead, defendants summarily conclude that "the District's purported failure to provide the plaintiffs with such a reason is not a valid basis for restricting the internal communications of the OAG." Id.

But, if the documents defendants seeks become relevant to the administrative proceeding, I will modify the order to permit other lawyers in the Attorney General's Office to have access to them under the protective order. Indeed, if as the defendants suggest, they are contemplating settling the civil and administrative simultaneously, and they can [*11] convince me that the lawyers engaged in both cases need them to prepare for and engage in meaningful settlement discussions, I will also modify the protective order accordingly.

## CONCLUSION

Plaintiffs have a valid interest in seeking to limit access to the document at issue, given their personal nature. It is therefore not unreasonable for plaintiffs to seek to limit access to these documents to only those attorneys working on the civil case or to require defendants to expend the resources necessary to insure that this occurs.

An Order accompanies this Memorandum Opinion.

Dated: March 1, 2005

2005 U.S. Dist. LEXIS 2935, *

JOHN M. FACCIOLA

UNITED STATES MAGISTRATE JUDGE

**ORDER**

In accordance with the accompanying Memorandum Opinion, it is, therefore, hereby, **ORDERED** Plaintiffs'

Motion for Protective Order [# 27] is **GRANTED. SO ORDERED.**

Dated: March 1, 2005

JOHN M. FACCIOLA

UNITED STATES MAGISTRATE JUDGE

# Exhibit F

LEXSEE 2005 US DIST LEXIS 14695

**JONATHAN E. PESKOFF, Plaintiff, v. MICHAEL A. FABER, Defendant.**

**Civil Action No. 04-526 (HHK/JMF)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2005 U.S. Dist. LEXIS 14695*

**July 22, 2005, Decided**

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For JONATHAN E. PESKOFF, Plaintiff: Paul Yoshio Kiyonaga, KIYONAGA & SOLTIS, Washington, DC.

For MICHAEL A. FABER, Defendant: William A. Davis, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, P.C., Washington, DC.

**JUDGES:** JOHN M. FACCIOLA, U.S. MAGISTRATE JUDGE.

**OPINIONBY:** JOHN M. FACCIOLA

**OPINION:**

### MEMORANDUM OPINION

This case was referred to me for resolution of eight discovery motions, the first five of which are Motions for a Protective Order. Upon consideration of the motions, oppositions, and replies and for the reasons stated herein, Defendant's Motion for Protective Order Concerning Plaintiff's Subpoena to United Bank for Defendant's Personal Bank Records [# 15] is denied in part and granted in part; Defendant's Motion for a Protective Order and Supporting Memorandum Concerning Plaintiff's Subpoena to Non-Party Mark Levine [# 27] is denied in part and granted in part; Defendant's Motion and Supporting Memorandum Requesting Entry of a Protective Order Governing the Confidentiality of Discovery Materials [# 31] is denied in part and granted in part; Plaintiff's Motion for Protective Order Concerning Defendant's Subpoena *Duces Tecum* to Joseph Estabrook [# [*2] 24] is granted *nunc pro tunc*; Plaintiff's Motion for Protective Order Concerning Defendant's Subpeona *Duces Tecum* and *Ad Testificandum* to Joel Lesch [# 25] is granted *nunc pro tunc*; Plaintiff's Motion for Extension of Discovery Period and Corresponding Modification of Scheduling Order [# 16] is granted; Plaintiff's Motion for

Additional Depositions [# 20] is granted; and Plaintiff's Consent Motion for Telephonic Conference Prior to Filing Motions to Compel Discovery [# 21] is denied as moot.

### BACKGROUND

#### I. Plaintiff's Claims

Plaintiff Jonathan E. Peskoff ("Peskoff") brings this action to recover damages for financial injury he suffered as a result of alleged conduct by defendant Michael A. Faber ("Faber") in connection with the operation of the NextPoint venture capital fund and its related entities ("the NextPoint entities"). Complaint at 1. The plaintiff's specific allegations are: fraud in the inducement; breach of fiduciary duty; breach of contract; conversion; common law fraud and deceit; unjust enrichment; and violations of *18 U.S.C. § § 1962(c)* and *1964(c)* (Civil RICO). Id. at 15-22.

#### II. [*3] The NextPoint Entities

NextPoint GP, LLC ("the General Partner") is the general partner of a venture capital fund called NextPoint Partners, LP ("the Fund"). Id. at 1. At all relevant times, both the plaintiff and defendant were managing members of the General Partner, though whether they were ever the *sole* managing members is disputed. Id. at 3; Answer at 15. Although the plaintiff is no longer a managing member as of February 13, 2004, he claims the retention of a membership interest. Complaint at 3. No LLC agreement governing the operation and composition of the General Partner was ever signed. Id. at 3; Answer at 19-20.

The NextPoint Management Company, Inc. ("the Management Company") was organized by the defendant as a vehicle for receiving the management fees due from the Fund to the General Partner and for paying salaries and other expenses. Its purpose was to enable the General Partner to fulfill its management responsibilities to the Fund under the LP agreement. Complaint at 8; An-

swer at 26. The defendant believes that he was and is the sole owner of the Management Company. Complaint at 14; Answer at 26. The plaintiff contends [*4] that he and the defendant were co-owners of the Management Company in equal share. Complaint at 14.

Plaza Street Holdings, Inc. ("Plaza Street Holdings") is a corporation that was paid by the Management Company for consulting services. Id. at 10. Plaza Street Holdings was and is controlled solely by the defendant. Complaint at 10; Answer at 29.

## DISCUSSION

I. Motions for Protective Order

A. *Legal Standards*

Federal Rule of Civil Procedure ("Rule") 26(c) provides:

> Upon motion by a party or by the person from whom discovery is sought, accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action, and for good cause shown, the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . .

'" Although the Rule contains no specific reference to privacy or to other rights or interests that may be implicated, such matters are implicit in the broad purpose and language of the Rule. [*5] '" *Tavoulareas v. Washington Post, 111 F.R.D. 653, 661 (D.D.C. 1986)* (quoting *Seattle Times Co. v. Rhinehart, 467 U.S. 20, 35 n. 21, 81 L. Ed. 2d 17, 104 S. Ct. 2199 (1984)*).

To show good cause for entry of a protective order, "the movant must articulate specific facts to support its request and cannot rely on speculative or conclusory statements . . . ." *Low v. Whitman, 207 F.R.D. 9, 10-11 (D.D.C. 2002)* (citing *Jennings v. Family Mgmt., 201 F.R.D. 272, 275 (D.D.C. 2001)* (citations omitted)). In addition, "district courts assessing the existence of good cause must exercise their discretion in light of the relevant facts and circumstances of a particular case." *Tavoulareas, 111 F.R.D. at 658* (citing *Nixon v. Warner Communications, Inc., 435 U.S. 589, 599, 55 L. Ed. 2d 570, 98 S. Ct. 1306 (1978)*).

It bears emphasis that a party is only entitled to discovery of information relevant to the claims or defenses asserted in the case. *Fed. R. Civ. P. 26(b)(1)*. When fraud or mistake is alleged, relevance must be assessed in light of the requirements of *Rule 9(b)*, which states: "In all [*6] averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Fed. R. Civ. P. 9(b)*. See also *United States ex rel. Fisher v. Network Software Assoc., 227 F.R.D. 4, 9-10 (D.D.C. 2005)*. In addition to ensuring that a defendant has notice of the claim, *Fisher, 227 F.R.D. at 9* (citing *Anderson v. USAA Cas. Ins. Co., 221 F.R.D. 250, 252-53 (D.D.C. 2004)*), *Rule 9(b)* aims to "prevent a claim from being filed as a 'pretext for the discovery of unknown wrongs.'" Id. (quoting *Kowal v. MCI Communications Corp., 305 U.S. App. D.C. 60, 16 F.3d 1271, 1279 n. 3 (D.C. Cir. 1994)*).

B. *Analysis*

1. Defendant's Motion for Protective Order Concerning Plaintiff's Subpeona to United Bank for Defendant's Personal Bank Records

On October 20, 2004, the plaintiff served a subpoena *duces tecum* on non-party United Bank, requesting all bank records relating to any NextPoint entity and all bank records relating to the defendant. Plaintiff's Opposition to Defendant's Motion for Protective Order ("Pl.'s Opp'n # 18") at 2. In response, [*7] the defendant filed a motion for a protective order to prevent the execution of the subpoena. Defendant's Motion for a Protective Order Concerning Plaintiff's Subpeona to United Bank for Defendant's Personal Bank Records ("Def.'s Mot. # 15") at 1. Specifically, the defendant claims that:

> 1. The personal bank records are irrelevant;
>
> 2. The sole purpose of the subpeona is to harass and embarrass; and
>
> 3. The request for NextPoint's records is duplicative because NextPoint has already agreed to produce its bank records.

Memorandum of Points and Authorities in Support of Defendant's Motion for a Protective Order ("Def's. Mem. of P. & A.") at 1-2.

As for the discovery of Union Bank's records relating to the NextPoint entities, the defendant's only argument for a protective order is that such a request is duplicative because the plaintiff can obtain the same records directly from NextPoint. However, because it remains

unclear to this Court whether the plaintiff has obtained, or will in fact obtain, those same records, the potential for duplicative discovery cannot be determined. Absent any specific representation of duplication, undue burden, or expense, [*8] this Court cannot find that the defendant has shown good cause for the entry of a protective order as to NextPoint's records.

The analysis is different regarding the plaintiff's request for the defendant's personal bank records. The application of *Rule 9(b)* to discovery requires the Court to assess the relevance of the information sought in light of particularized claims, rather than general assertions. Therefore, to order the production of the defendant's personal bank records, the Court would have to find a connection between the defendant's accounts and specific allegations in the plaintiff's complaint. On this record, the Court fails to find such a connection.

In his opposition, the plaintiff cites five claims that he believes put the defendant's personal records at issue. The first is a general allegation of "egregious fraudulent and deceitful conduct by [the defendant] in connection with the operation of a venture capital fund and its related entities." Complaint at 1. As written, this claim only implicates the defendant in a business capacity and does not describe any specific activity relating to the defendant's personal finances.

The second allegation is that the [*9] defendant "used the Management Company as an enterprise . . . with the purpose of diverting a substantial portion of the funds to pay fees for bogus consulting services to [defendant]-affiliated entities, to discharge his own personal expenses, and to make personal investments unrelated to the Fund." Complaint at 4. The plaintiff argues that the personal account information is relevant to this claim because it is necessary to determine whether the fees paid by the Management Company "made it back to the defendant's pocket." Pl.'s Opp'n # 18 at 6. The defendant, however, contends that the plaintiff's claim has not put any transactions at issue other than the expenditures by the Management Company and has failed to show any connection between those expenditures and the defendant's personal accounts. Reply Memorandum in Further Support of Defendant's Motion for a Protective Order re Subpoena to United Bank ("Def.'s Reply # 22") at 2.

While the plaintiff's claim does allege the diversion of money from the Management Company for the defendant's personal use, it fails to specifically implicate the role of the defendant's personal bank accounts. Even if the defendant did use Management [*10] Company funds to discharge personal expenses or make personal investments, the plaintiff has failed to explain why any such transactions could not be exposed via the financial records of the NextPoint entities (which would include the financial records of the Management Company) and the defendant-affiliated consulting services. Until a persuasive argument is made based on a review of the NextPoint entities' financial records, this Court will not order the production of the defendant's personal account information. To do otherwise, in this Court's view, would allow an unwarranted fishing expedition.

The plaintiff's third allegation is that the defendant unilaterally increased his own salary while offering as justification the fact that he had put up a personal Certificate of Deposit for a line of credit for the Management Company and invested other personal monies in the Fund. Complaint at 9. According to the plaintiff, allegations of such co-mingling make the defendant's personal bank records "indisputably relevant." Pl.'s Opp'n # 18 at 5. The plaintiff also argues that documents related to the line of credit are relevant because they could contain information regarding the ownership [*11] of the Management Company. Id. at 6. The defendant counters that there is nothing unusual about his using personal capital to grow the business. Def.'s Reply # 22 at 2-3.

While the defendant's personal finances are implicated by this claim in a general manner, the gravamen of the plaintiff's complaint is that the transactions made by the defendant were not in accordance with the plaintiff's understanding as to how financial decisions would be made at NextPoint. Absent the plaintiff's procedural objections, it is only alleged that the defendant was paid a salary, put up a personal Certificate of Deposit for a line of credit, and invested other personal monies in the NextPoint entities. An examination of the accounts of the NextPoint entities and the defendant-affiliated consulting companies should reveal the substance of these transactions. Further, since the line of credit was issued to the Management Company, and not to the defendant personally, such information should be produced by execution of the subpoena for "all bank records relating to any NextPoint entity." Pl.'s Opp'n # 18 at 2. On this record, this Court will not order the production of the defendant's personal account [*12] information without the plaintiff ever having advanced an argument based on a review of the NextPoint entities' financial records.

The fourth allegation is that the defendant caused the Management Company to make $ 400,000 in payments to Plaza Street Holdings for non-existent consulting services, the purpose of which was to divert funds to the defendant individually. Complaint at 10. Again, the claim is that the defendant allegedly made payments to a defendant-owned consulting company for nonexistent services. The transactions at issue here are between two businesses, and anything questionable in this regard should be discoverable by examining the records of the NextPoint entities and the defendant-owned consulting companies.

Finally, the plaintiff states that the defendant "took $ 105,000 that was due from himself, his wife, and another limited partner to satisfy their then-currently-due capital contributions to the Fund and, instead of remitting such amounts to the Fund's account as required under the LP Agreement, caused such amounts to be transferred to the Management Company (in one instance by endorsing over to the Management Company a check payable to the Fund)." Complaint [*13] at 13. The heart of this claim, much like the previous assertions, is that the defendant engaged in prohibited borrowing and advancement of fees as between two businesses. There is no allegation, however, that any of the borrowed or advanced management fees made their way into the personal accounts of the defendant. In addition, the plaintiff has not explained how the defendant's bank records would bear on the claim, other than to provide withdrawal dates for some or all of the $ 105,000 at issue.

The Court recognizes that the particularity requirement of *Rule 9(b)* does not abrogate the simplified notice pleading standard set forth in *Rule 8, Allen v. Beta Constr., 309 F. Supp. 2d 42, 46 (D.D.C. 2004)* (citing *United States v. Cannon, 206 U.S. App. D.C. 405, 642 F.2d 1373, 1386 (D.C. Cir. 1981)* (internal citation and quotation omitted)). The Court also acknowledges that there can be flexibility in the application of *Rule 9(b)* where the facts constituting the circumstances of the alleged fraud are peculiarly within the defendant's knowledge or control. *Kowal, 16 F.3d at 1279 n. 3* (citation omitted); *Neubronner v. Milken, 6 F.3d 666, 672 (9th Cir. 1993).* [*14] Further, the plaintiff need not provide the details at this preliminary stage of litigation that will be necessary to succeed on the merits of the case. *Allen, 309 F. Supp. 2d at 47.* However, a plaintiff who makes an allegation on information or belief must also state a factual basis for that belief. *Kowal, 16 F.3d at 1279 n. 3* (citations omitted). The transactions at issue in this case are between the NextPoint entities and defendant-affiliated businesses, and the plaintiff has not made any statement of fact implicating the involvement of the defendant's personal accounts. On balance, the plaintiff's non-specific desire to "follow the money," Pl.'s Opp'n # 18 at 7, cannot outweigh the defendant's privacy interests or his interest in the protection against claims filed as a "pretext for the discovery of unknown wrongs." *Kowal, 16 F.3d at 1279 n. 3* (citation omitted). Thus, on this record, the defendant is entitled to a protective order regarding his personal accounts.

Finally, the plaintiff's attempt to discover the defendant's personal financial information by arguing its relevance to punitive damages is unavailing. In *John Does I-VI v. Yogi, 110 F.R.D. 629 (D.D.C. 1986),* [*15] the court found that the defendant's personal financial information was relevant to the question of punitive damages

but ordered that it "should not be revealed until necessary" to prove those damages. *Yogi, 110 F.R.D. at 633.* Such protection is particularly appropriate in this case, where there is no other basis for the release of the information and its absence does not prevent the plaintiff from making otherwise relevant discovery.

2. Defendant's Motion for a Protective Order and Supporting Memorandum Concerning Plaintiff's Subpoena to Non-Party Mark Levine

On November 15, 2004, the plaintiff served a subpoena *duces tecum* and *ad testificandum* on non-party Mark Levine for all documents and testimony relating to the action Seynhaeve et al. v. Plaza Street Holdings, Inc. and Michael Faber, which was brought on June 14, 2000 in the United States District Court for the District of Maryland. Defendant's Motion for a Protective Order and Supporting Memorandum Concerning Plaintiff's Subpoena to Non-Party Mark Levine ("Def.'s Mot. # 27") at 1-2. The Seynhaeve suit alleged common law fraud, conversion, and unjust enrichment and was settled out [*16] of court. Plaintiff's Opposition to Defendant's Motion for Protective Order Regarding Subpoena Duces Tecum and Ad Testificandum Served on Mark Levine ("Pl.'s Opp'n # 28") at 2-3. Mr. Levine was a shareholder of Venture Management Consultants, LLC ("Venture"), one of the plaintiffs in the Seynhaeve litigation. Def.'s Mot. # 27 at 2. Neither Mr. Levine nor Venture has any relationship with the NextPoint entities. Id.

The defendant claims that execution of the subpoena will be a waste of the parties' time and will serve only to embarrass and harass the defendant. Id. The defendant also claims that the discovery sought could not reasonably lead to admissible evidence because the allegation of prior bad acts does not tend to make the plaintiff's current claims more or less probable than they would be without the evidence. Id. Finally, and seemingly as an afterthought, the defendant concludes that if the subpoena is allowed to be executed, the Court should issue a protective order upholding the confidentiality of the information sought, as it is already "the subject of a strict confidentiality agreement." Defendant's Reply in Further Support of Motion for a Protective [*17] Order Concerning Plaintiff's Subpoena to Non-Party Mark Levine ("Def.'s Reply # 30") at 5. The defendant does not describe the nature or extent of the confidentiality agreement to which he refers.

In response, the plaintiff contends that the discovery sought is specifically relevant to two of his claims. The first is that the defendant made false and misleading statements to induce the plaintiff to accept a NextPoint partnership. Pl.'s Opp'n # 28 at 2. According to the plaintiff, the defendant made assurances that he had not been sued previously and was not the subject of threatened

litigation. Id. at 2-3. The second claim is that the defendant, both in the Seynhaeve litigation and the current case, used Plaza Street Holdings "as an enterprise through which to defraud investors or business partners in his venture capital entities." Id. at 3 (citing Complaint at 21-22).

First and foremost, Mr. Levine cannot be instructed by this Court to provide any information regarding the Seynhaeve litigation that is currently protected by a confidentiality agreement ordered or approved by another court. Because Seynhaeve was litigated in the United States District Court [*18] for the District of Maryland, this Court can only assume that any existing court-ordered or court-approved agreement was entered by that court. Therefore, to access Seynhaeve litigation materials shielded from public view by a such confidentiality agreement, the plaintiff must seek intervention in the District of Maryland. See *In re Vitamins Antitrust Litig., 2001 U.S. Dist. LEXIS 25068, No. MISC. 99-197, 2001 WL 34088808 at *5 (D.D.C. 2001)* ("Like every other circuit to consider the issue, this Circuit has held that permissive intervention is the proper procedure for a non-party to seek modification of a protective order."). Even if a confidentiality agreement was only stipulated between the Seynhaeve litigants and did not involve the Maryland District Court, this Court would have to review the terms of the agreement and be fully briefed by both parties before Mr. Levine could be compelled to testify in a manner breaching that agreement. Therefore, Mr. Levine's testimony may be allowed by this Court only to the extent that it is relevant and does not violate the terms of any court-ordered, court-approved, or privately stipulated confidentiality agreement. This Court expects counsel to [*19] scrupulously comply with this requirement.

The discovery sought is relevant to the first-cited claim of fraud in the inducement because Mr. Levine, as a shareholder of Venture, might have information regarding whether a lawsuit had been threatened at the time of the defendant's alleged representation. The claim is also pled with the particularity required by *Rule 9(b)*, see Complaint at 5, specifying the "time, place, and content of the false misrepresentations, the misrepresented fact, and what the opponent retained or the claimant lost as a consequence of the alleged fraud." *Fisher, 227 F.R.D. at 9.*

The requested discovery is also relevant to the Civil RICO allegation, which requires the plaintiff to show a pattern of racketeering activity. See *Wallace v. Abramson, No. 85-4039 JHP, 1988 WL 63065, at *4 (D.D.C. 1988)* (holding that a one million dollar bank loan, "even though causing no injury to the plaintiff, may represent another of the series of acts which plaintiff charges as a part of the continuing pattern of racketeering activity").

While the particularity requirement of *Rule 9(b)* "applies with full force when fraud is identified as a predicate act [*20] to a pattern of racketeering activity under RICO," id. at *3 (citations omitted), the requirement "must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim." *Corley v. Rosewood Care Ctr., Inc., 142 F.3d 1041, 1051 (7th Cir. 1998)*. In this case, Mr. Levine, as a shareholder of Venture, certainly has knowledge regarding whether the Seynhaeve litigation was threatened against the defendant at the time of his alleged misrepresentation to the plaintiff. The same is true of the involvement of Plaza Street Holdings, Inc., in the events leading up to that litigation. There are also facts supporting the plaintiff's pleadings that are sufficient to allow discovery per *Rule 9(b)* (namely, the existence of similar allegations and the involvement of Plaza Street Holdings in both the Seynhaeve litigation and the instant case).

Because the requested discovery is relevant to both the fraud and Civil RICO claims, the defendant must demonstrate good cause in order for this Court to grant a protective order. To show good cause:

> The movant must articulate specific facts to support its request and cannot rely on speculative or conclusory [*21] statements . . . Moreover, in the case of a protective order related to deposition testimony, courts regard the complete prohibition of a deposition as an [sic] 'extraordinary measures []' which should be resorted to only in rare occasions' . . . Accordingly, courts apply a balancing test weighing the movant's proffer of harm against the adversary's 'significant interest' in preparing for trial."

*Low, 207 F.R.D. at 10-11 (quoting Jennings, 201 F.R.D. at 275 (citations omitted)).* In this case, the defendant has failed to meet its burden.

The defendant has made only general claims of potential harassment and embarrassment, unsupported by evidence of the specific harm that will result from Mr. Levine's compliance with the subpoena. See *Jennings, 201 F.R.D. at 275* (requiring a demonstration of specific harm that will result from plaintiff's testimony). The defendant has also failed to show undue burden or expense on behalf of himself or Mr. Levine, notwithstanding Mr. Levine's apparent desire to avoid the deposition. Def.'s Reply # 30 at 4. The defendant does try to argue that any evidence proffered by Mr. Levine would [*22] go to prior bad acts and would therefore be inadmissible

at trial. However, because the substance of Mr. Levine's testimony has not been made clear to the Court, there is no basis upon which to gauge the veracity of the defendant's claim.

The Court must therefore refuse, in part, the defendant's request for a protective order, as the plaintiff's subpoena is reasonably calculated to lead to the discovery of admissible evidence. Nevertheless, Mr. Levine is instructed not to provide any information regarding the Seynhaeve litigation that is currently protected by a court-ordered, court-approved, or privately stipulated confidentiality agreement.

3. Defendant's Motion and Supporting Memorandum Requesting Entry of a Protective Order Governing the Confidentiality of Discovery Materials

Neither the plaintiff nor the defendant has any objection to the entry of a protective order governing the confidentiality of discovery materials in this case, and the parties have consulted with each other as to the proposed terms. Defendant's Motion and Supporting Memorandum Requesting Entry of a Protective Order Governing the Confidentiality of Discovery Materials ("Def.'s Mot. # 31") at [*23] 1; Plaintiff's Opposition to Defendant's Motion Requesting Entry of a Protective Order Governing the Confidentiality of Discovery Materials ("Pl.'s Opp'n # 34") at 1. However, despite an exchange of drafts in which the parties reached consensus on a majority of the language, disagreement remains on two key points: 1) whether the protection should extend to business/commercial information as well as personal information; and 2) whether the agreement should provide the ability to designate documents as confidential that are already in the possession of the opposing party. Def.'s Mot. # 31 at 1-2; Pl.'s Opp'n # 34 at 1-2.

The agreement proposed by the defendant defines "confidential information" as "all confidential and proprietary business, commercial, or personal financial information of the parties, including tax, salary, and/or bank account information." Def.'s Mot. # 31, Ex. C. In support of the proposed language, the defendant claims that business/commercial information is routinely protected under *Rule 26(c)(7)*, which provides for the protection of "trade secrets or other confidential research, development, or commercial information . . . ." Id. at 2; *Fed. R. Civ. P 26(c)(7)* [*24] . The defendant's proposal also provides that the "failure to designate documents or information [as confidential] at the time of production will not be construed as waiver so long as the documents or information are designated before trial of this action." Def.'s Mot. # 31, Ex. C. The defendant wishes to reserve the right of retroactive designation because he claims to have moved forward with discovery pending the Court's entry of a confidentiality agreement, "withholding noth-

ing on the ground of confidentiality." Id. at 2. The plaintiff, on the other hand, has thus far declined to produce any "personal, private" information in the absence of a protective order. Pl.'s Opp'n # 34 at 4.

In opposition, the plaintiff claims that the impetus for the formation of a confidentiality agreement was the plaintiff's subpoena *duces tecum* on United Bank, which included a request for information on any *personal* account(s) held by the defendant. Id. at 3. Given the plaintiff's understanding that the defendant's concern was personal privacy, the plaintiff asserts that there was no reason for him to believe that a forthcoming confidentiality agreement would govern any commercial information [*25] already produced by the defendant. Id. at 4, 7. The plaintiff further asserts that the retroactive designation of documents could prove problematic where documents have already been used in other contexts related to the case and that the defendant's claim is weakened by his having filed for a protective order in lieu of producing his personal bank records. Id. at 7. The plaintiff also believes that the language in the defendant's proposed order is overbroad and could apply to most, if not all, discovery materials. Pl.'s Opp'n # 34 at 7. The plaintiff has therefore suggested a protective order initially limited to "personal financial information of the parties." Id., Ex. 1. The proposed language would not allow the retroactive designation of documents, but would allow either party to modify the scope of the agreement for good cause shown and upon motion to the Court. Id.

The acrimonious tenor of the pleadings and motions in this action, more than any of the arguments proffered by the plaintiff or the defendant, convinces this Court of the futility of any confidentiality order that does not encompass both personal and business/commercial information.

> It is clear [*26] from experience that pretrial discovery . . . has a significant potential for abuse. This abuse is not limited to matters of delay and expense; discovery may also seriously implicate privacy interests of litigants and third parties. The Rules [of Civil Procedure] do not distinguish between public and private information . . . There is an opportunity, therefore, for litigants to obtain--incidentally or purposefully--information that not only is irrelevant but if publicly released could be damaging to reputation and privacy.

*Seattle Times, 467 U.S. at 34-35.*

Therefore, pursuant to *Rule 26(c)* and in the interests of protecting the information of parties and non-parties from improper disclosure, the Court will enter a confidentiality order with the following parameters:

1. "Confidential information" shall be defined as: a) any trade secret, or other confidential research, development, or commercial information, as such terms are used in *Federal Rule of Civil Procedure 26(c)(7)*, of a party or protected person that, if disclosed, would materially affect the party or protected person's business, commercial, or financial [*27] interests; or b) any financial information of a party or protected person, including tax, salary, or bank account information, that, if disclosed, would prove materially damaging to that party's or person's reputation or invasive of his or her privacy.

2. A "protected person" shall be defined as any non-party who voluntarily or in response to discovery in this action produced or produces any information to any party in connection with this action.

3. Any document, deposition testimony, deposition transcripts and exhibits, or other response to requests for information produced in response to discovery requests in this action may be designated by any party or protected person as "confidential," to the extent that such information constitutes confidential information as defined above.

4. A party that has previously produced information to another party in connection with this action, whether voluntarily or in response to a discovery request, may designate such information as confidential. A party shall make confidentiality designations for documents and information within ten days of the entry of the confidentiality order, and in the meantime, parties shall treat all [*28] material as confidential. However, the previous disclosure of materials not heretofore designated as confidential shall not be actionable, provided that no additional disclosure of those materials occurs in violation of the confidentiality order.

5. Information and documents previously produced by a protected person to a party in connection with this action shall be treated as if designated confidential, unless and until the person submitting the information authorizes disclosure.

6. A party or protected person may designate as confidential any information it hereinafter produces, either voluntarily or pursuant to discovery in this action, to any party in connection with this action.

The full text of the confidentiality order will be issued separately, concurrent with this Memorandum Opinion.

4. Plaintiff's Motion for Protective Order Concerning Defendant's Subpoena *Duces Tecum* to Joseph Estabrook

On November 24, 2004, the plaintiff filed a motion for a protective order concerning the defendant's subpoena *duces tecum* of Mr. Joseph Estabrook. The plaintiff requests that document production, originally scheduled for November 26, 2004, be postponed due to [*29] the closure of Mr. Estabrook's offices for the Thanksgiving holiday. The motion is unopposed, and this Court therefore grants the motion *nunc pro tunc*, with production to take place on a date agreed upon by the parties, if it has not already occurred.

5. Plaintiff's Motion for Protective Order Concerning Defendant's Subpoena *Duces Tecum* and *Ad Testificandum* to Joel Lesch

On November 24, 2004, the plaintiff also filed a motion for a protective order concerning the defendant's subpoena *duces tecum* and *ad testificandum* of Mr. Joel Lesch. The plaintiff first requests that document production, originally scheduled for November 26, 2004, be postponed due to the closure of Mr. Lesch's offices for the Thanksgiving holiday. The plaintiff also asks that the deposition of Mr. Lesch be rescheduled from November 30, 2004, as plaintiff's counsel had previously noticed another deposition for that date. The motion is unopposed, and the Court therefore grants the motion *nunc pro tunc*, with document production and deposition to take place on dates agreed upon by the parties, if they have not already occurred.

II. Plaintiff's Motion for Extension of Discovery Period and [*30] Corresponding Modification of Scheduling Order

Although discovery in this matter was scheduled to end on December 1, 2004, it would have been impossible for the parties to complete discovery without resolution of the motions addressed herein. Therefore, the Court

extends the discovery deadline to August 19, 2005, solely for the purposes of complying with this Opinion and accompanying Order.

### III. Plaintiff's Motion for Additional Depositions

On November 18, 2004, the plaintiff filed a motion to allow him to take three depositions beyond the five originally permitted by the Court's Scheduling Order. Plaintiff's Motion for Additional Depositions ("Pl's. Mot.") at 4. The defendant did not file an opposition to the request.

Given that the Scheduling Order will be altered to allow for the completion of outstanding discovery, the Court cannot see how allowing the additional depositions would be overly burdensome to the defendant. The Court will therefore permit the plaintiff three depositions in addition to the five originally permitted, provided that they are completed before the close of the extended discovery period.

### IV. Plaintiff's Consent Motion for Telephonic Conference [*31] Prior to Filing Motions to Compel Discovery

Plaintiff's consent motion for a telephonic conference prior to filing a motion to compel discovery is denied as moot. Should any future discovery disputes arise, however, the parties shall jointly call chambers to set up a telephonic conference prior to the filing of any motion.

### CONCLUSION

A detailed Order accompanies this Memorandum Opinion.

JOHN M. FACCIOLA

U.S. MAGISTRATE JUDGE

Date: July 22, 2005

### EXHIBIT    A    CONFIDENTIALITY AGREEMENT

I have read and am familiar with the terms of the Confidentiality Agreement governing the disclosure of information in the case of Peskoff v. Faber, Case No. 1-04-CV-00526 (HHK/JMF), and I agree to abide by all terms of said Agreement and not to reveal or otherwise communicate any of the information disclosed to me pursuant thereto to anyone except in accordance with the terms of said Agreement. I agree not to make use of any information or material obtained pursuant to that Agreement other than for purposes of this litigation.

I also agree to return to counsel of record not later than 30 days after the termination of this litigation any and all documents in my possession containing [*32] information which is the subject of said Agreement.

Name:

Date:

### PROTECTIVE ORDER

Pursuant to *Federal Rule of Civil Procedure 26(c)(7)*, and in the interest of protecting information of the parties and non-parties from improper disclosure, the undersigned hereby stipulate, subject to approval and entry by the court, to the following Protective Order:

1. "Confidential information" shall be defined as: a) any trade secret, or other confidential research, development, or commercial information, as such terms are used in *Federal Rule of Civil Procedure 26(c)(7)*, of a party or protected person that, if disclosed, would materially affect the party or protected person's business, commercial, or financial interests; or b) any financial information of a party or protected person, including tax, salary, or bank account information, that, if disclosed, would prove materially damaging to that party's or person's reputation or invasive of his or her privacy.

2. A "protected person" shall be defined as any non-party who voluntarily or in response to discovery in this [*33] action produced or produces any information to any party in connection with this action.

3. Any document, deposition testimony, deposition transcripts and exhibits, or other response to requests for information produced in response to discovery requests in this action may be designated by any party or protected person as "confidential," to the extent that such information constitutes confidential information as defined above.

4. A party that has previously produced information to another party in connection with this action, whether voluntarily or in response to a discovery request, may designate such information as confidential. A party shall make confidentiality designations for documents and information within ten days of the entry of the confidentiality order, and in the meantime, parties shall treat all material as confidential. However, the previous disclosure of mate-

2005 U.S. Dist. LEXIS 14695, *

rials not heretofore designated as confidential shall not be actionable, provided that no additional disclosure of those materials occurs in violation of the confidentiality order.

5. Information and documents previously produced by a protected person to a party in connection with this action shall [*34] be treated as if designated confidential, unless and until the person submitting the information authorizes disclosure.

6. A party or protected person may designate as confidential any information it hereinafter produces, either voluntarily or pursuant to discovery in this action, to any party in connection with this action.

7. Confidential documents and information, including copies or summaries thereof, shall be used only for the prosecution or defense of this action and shall not be used or employed for any other purposes whatsoever. Confidential information shall not be disclosed or made available to anyone except:

>  (a) the Court;

>  (b) the parties to this action, and officers, directors or employees of the parties who are actively participating in the prosecution or defense of this action (including, but not limited to any mediation, arbitration, or other settlement process, as well as appeals of this action);

>  (c) counsel for the parties to this action and employees of said counsel;

>  (d) experts or consultants specifically retained by the parties or their attorneys to assist them in the preparation of this case or serve as expert witnesses at the [*35] trial of this action;

>  (e) third-party witnesses whom counsel reasonably deem necessary for the preparation and trial of this action; and

>  (f) court reporters engaged to record depositions, hearings, or trials in this action.

8. Disclosure of Confidential Information pursuant to this Agreement shall be handled as follows:

>  (a) Any person described in subparagraphs 7(a), (b), and (c) of this Agreement is bound by the provisions of this Agreement without the necessity of executing a confidentiality agreement;

>  (b) Any person described in subparagraph 3(f) of this Agreement is bound by the provisions of this Agreement without the necessity of executing a confidentiality agreement if he or she notes his or her agreement on the record;

>  (c) Before Confidential Information is disclosed to any person set forth in subparagraphs 7(d) and (e) of this Agreement, the party disclosing the information shall inform the person to whom the disclosure is to be made, in writing, at least five (5) days in advance, that Confidential Information shall be used for the purposes of the prosecution or defense of this action only, and shall obtain from the person to whom the [*36] disclosure is to be made a signed confidentiality agreement in

the form attached hereto as Exhibit "A"; and

(d) As long as Confidential Information is handled in accordance with this Agreement, this Agreement shall not be construed as prohibiting or restricting the use of Confidential Information during depositions, any hearing, the trial of this matter, or any appellate proceeding.

9. If a party or witness wishes to designate any portion of a deposition as Confidential Information, the party or witness seeking the designation shall notify the court reporter and opposing counsel of record within 30 days after the deposition that such party or witness intends to designate certain portions of the deposition transcript as Confidential Information. The designating party or witness shall have 30 days after receipt of the transcript to designate portions of the transcript as Confidential Information and inform counsel of record in writing of such designation.

10. Nothing in this Agreement shall prevent the disclosure of Confidential Information beyond the terms of this Agreement if the party or witness who produced the information consents in advance in writing.

11. [*37] This Agreement shall not limit or in any way restrict the right of any person or entity to use, disseminate, dispose of, or otherwise benefit from documents or information obtained (i) other than through discovery in this action, or (ii) from any person or entity with authority to provide such documents or information independent of any confidentiality requirement imposed by this Agreement.

12. If any party hereto disagrees with the designation of any discovery materials as confidential, counsel shall attempt to resolve the disagreement on an informal basis. If it is necessary to present the dispute to the Court for resolution, the material in question shall continue to be treated as confidential under the terms of this Agreement unless and until the Court issues a final ruling that the material is not of a confidential nature.

13. This Agreement shall remain in effect during the pendency of this case and subsequent to its termination so as to protect the confidentiality of the Confidential Information.

14. The parties agree to return to counsel of record producing such documents, not later than 30 days after the termination of this litigation, including appeals, [*38] any and all documents and copies thereof in their possession or control containing information which is the subject of this Agreement.

**APPROVED AND SO ORDERED.**

**ORDER**

Pursuant to the accompanying Memorandum Opinion, the following is hereby **ORDERED:**

1. Defendant's Motion for Protective Order Concerning Plaintiff's Subpeona to United Bank for Defendant's Personal Bank Records [#15] is **DENIED** in part and **Granted** in part.

2. Defendant's Motion for a Protective Order and Supporting Memorandum Concerning Plaintiff's Subpeona to Non-Party Mark Levine [#27] is **DENIED** in part and **GRANTED** in part.

3. Defendant's Motion and Supporting memorandum Requesting Entry of a Protective Order Governing the Confidentiality of Discovery Materials [#31] is **DENIED** in part and **GRANTED** in part.

4. Plaintiff's Motion for Protective Order Concerning Defendant's Subpeona Duces Tecum to Joseph Estabrook [#24] is **GRANTED** nunc pro tunc.

5. Plaintiff's Motion for Protective Order Concerning Defendant's Subpeona Duces Tecum and Ad Testificandum to Joel

2005 U.S. Dist. LEXIS 14695, *

Lesch [#25] is **GRANTED** nunc pro [*39] tunc.

6. Plaintiff's Motion for Extension of Discovery Period and Corresponding Modification of Scheduling Order [#16] is **GRANTED**. The Court extends the discovery deadline to August 19, 2005 solely for the purposes of complying with this Order and the accompanying Opinion.

7. Plaintiff's Motion for Additional Depositions [#20] is **GRANTED**.

8. Plaintiff's Consent Motion for Telephonic Conference Prior to Filing Motions to Compel Discovery [#21] is **DENIED** as moot.

**SO ORDERED.**

JOHN M. FACCIOLA

UNITED STATES MAGISTRATE JUDGE

Dated: July 22, 2005

# Exhibit G

LEXSEE 1999 US APP LEXIS 16712

**JENNIFER C. MILLER, Plaintiff-Appellant, v. REGENTS OF THE UNIVERSITY OF COLORADO; JAMES CORBRIDGE, Defendants-Appellees.**

No. 98-1012

**UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT**

*1999 U.S. App. LEXIS 16712; 1999 Colo. J. C.A.R. 4411*

**July 19, 1999, Filed**

**NOTICE:** [*1] RULES OF THE TENTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:**

Reported in Table Case Format at: *1999 U.S. App. LEXIS 28605.*

**PRIOR HISTORY:** (D. Colo.). (D.Ct. No. 95-S-2929).

**DISPOSITION:** AFFIRMED.

**LexisNexis(R) Headnotes**

**COUNSEL:** For JENNIFER C. MILLER, Plaintiff - Appellant: David K. Rees, Rees & Associates, P.C., Denver, CO. Shannon A. Robinson, Denver, CO.

For REGENTS OF THE UNIVERSITY OF COLORADO, Defendant - Appellee: Joanne M. McDevitt. Simon Paul Lipstein, University of Colorado, Denver, CO. Stephen Walsh Zweck-Bronner.

For JAMES CORBRIDGE, Defendant - Appellee: Thomas S. Rice, Alenka Jana Han, Senter, Goldfarb & Rice, Denver, CO.

**JUDGES:** Before BRORBY, HOLLOWAY, and BRISCOE, Circuit Judges.

**OPINIONBY:** WADE BRORBY

**OPINION:**

**ORDER AND JUDGMENT \***

\* This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[*2]

Appellant Jennifer Miller brought this action against her former employer the Regents of the University of Colorado ("the University") and her former supervisor James Corbridge alleging sex discrimination in violation of Title VII of the Civil Rights Act of, *42 U.S.C. § 2000e et seq.*, and *42 U.S.C. § 1983.* The district court granted summary judgment in favor of the University and Mr. Corbridge. Ms. Miller now appeals that ruling and various discovery limitations imposed by the district court. We have jurisdiction pursuant to *28 U.S.C. § 1291* and affirm.

I. Background

Ms. Miller served as an assistant to Mr. Corbridge, the then Chancellor of the University's Boulder campus. During her tenure in the Chancellor's office, Ms. Miller alleges Mr. Corbridge subjected her to both *quid pro quo* and hostile work environment sexual discrimination. The alleged harassment began shortly after she started work in 1988, when Mr. Corbridge "leered" at her as she walked down a public hallway. Shortly thereafter, Mr. Corbridge asked Ms. Miller out for drinks on at least two occasions and invited her to attend "Friday [*3] Afternoon Club" social gatherings at the law school on five to ten occasions. Ms. Miller declined all invitations. Mr. Corbridge stopped extending invitations to Ms. Miller by early 1989. Further, Ms. Miller claims Mr. Corbridge touched her in ways she found inappropriate, including hugging her twice (*id.* at 153-57), standing behind or beside her so closely that their bodies touched on several

Case 1:05-cv-01434-PLF     Document 9-4     Filed 09/23/2005     Page 20 of 29

Page 2

1999 U.S. App. LEXIS 16712, *; 1999 Colo. J. C.A.R. 4411

occasions, and rubbing her back and shoulders a few times. All the allegedly inappropriate touching ended by fall of 1993. Ms. Miller also contends Mr. Corbridge harassed her by requiring her to place phone calls and make appointments with various female acquaintances and, on at least three occasions, asking her to chill wine for after work meetings. Ms. Miller admits Mr. Corbridge never made any overt requests for sexual favors. However, she contends that because she rebuffed his sexual overtures, Mr. Corbridge verbally harassed and humiliated her in front of other employees and reassigned some of her job duties to other employees. At the same time, Ms. Miller claims more "compliant" female employees did not suffer such treatment and, in some cases, Mr. Corbridge allegedly rewarded those [*4] women with job benefits. Mr. Corbridge resigned as Chancellor effective August 1, 1994. Shortly thereafter, Ms. Miller took an extended leave of absence and eventually resigned from the University in April 1995.

In addition to the conduct Mr. Corbridge allegedly directed at her, Ms. Miller also points to Mr. Corbridge's treatment of other female employees as proof of sexual harassment. Some of the alleged incidents Ms. Miller claims she witnessed during her employment, and others she discovered only after filing this suit. Ms. Miller claims she personally witnessed the following events during her employment:

> (1) Mr. Corbridge frequently called and met with three female University employees, Ms. Marie Caldwell, Ms. Lisa Vann and Ms. Mary Jo White. Ms. Miller often placed the calls and arranged the meetings with these women and she surmised Mr. Corbridge had sexual relationships with them. However, Ms. Miller admits she had no personal knowledge of any such relationship during her employment, never overheard Mr. Corbridge's phone conversations with the women, and never observed any of their meetings.

> (2) Mr. Corbridge frequently called and met with Ms. Pauline Hale, the University's [*5] Director of Public Relations. Ms. Miller claims she knew Mr. Corbridge was having a sexual relationship with Ms. Hale because they traveled together and lived together. Mr. Corbridge and Ms. Hale married in 1992. Mr. Corbridge required Ms. Miller to assist in planning their wedding.

> (3) Mr. Corbridge touched Ms. Jane Branigan, an employee in the Chancellor's office, on the face and hair on one occa-

sion. Ms. Miller also learned that Mr. Corbridge and Ms. Branigan had drinks after work once.

> (4) Mr. Corbridge leered at and touched other women throughout Ms. Miller's tenure in the Chancellor's office. Ms. Miller cannot specify the dates on which these incidents occurred or what women they involved.

> (5) Ms. Susan Hobson-Panico, a University employee, told Ms. Miller that Mr. Corbridge kissed her during a break in a Regent's meeting. Ms. Miller did not personally witness the alleged kiss.

The evidence Ms. Miller learned about through discovery but had no personal knowledge of during her employment includes:

> (1) Ms. Caldwell's testimony that she had an ongoing sexual relationship Mr. Corbridge.

> (2) Former University President Judith Albino's version of a complaint, related [*6] to her secondhand by her executive assistant, that Mr. Corbridge paid unwanted attention to and touched a secretary named "Melissa" who worked in President Albino's office. Ms. Albino also testified to her secondhand knowledge of other rumored complaints against Mr. Corbridge. However, Ms. Albino never revealed the names of those women and Ms. Miller never spoke to the alleged complainants directly.

> (3) Ms. Hobson-Panico's testimony that Mr. Corbridge touched her in an inappropriate manner on several occasions including grabbing her scarf, whispering in her ear, kissing her, and putting his arm around her.

> (4) Testimony by Ms. Marianne Wesson, a University law professor, that Mr. Corbridge had a reputation for inappropriate sexual conduct toward female employees and on one occasion touched her thigh during a social gathering off campus.

> (5) Testimony by Ms. Emily Calhoun and Ms. Kaye Howe, both University professors, that Mr. Corbridge had a reputa-

Case 1:05-cv-01434-PLF    Document 9-4    Filed 09/23/2005    Page 21 of 29

Page 3

1999 U.S. App. LEXIS 16712, *; 1999 Colo. J. C.A.R. 4411

tion for engaging in inappropriate sexual conduct toward female employees.

Based on this evidence, Ms. Miller's Revised Amended Complaint alleged Title VII *quid pro quo* and hostile work environment claims against the University [*7] and a *42 U.S.C. § 1983* deprivation of civil rights claim against Mr. Corbridge individually.

Discovery was highly contentious. Early in the process, the defendants moved for a protective order due to the "sensitive nature" of Ms. Miller's allegations, the potential for harassment and undue embarrassment, and significant media coverage of the case. n1 After a hearing, the magistrate judge granted the motion and issued an order limiting the scope and subject matter of future depositions and restricting distribution of discovery materials. Despite Ms. Miller's numerous objections, the district court upheld the protective order and discovery continued subject to its limitations. Subsequently, Ms. Miller filed a series of motions to compel in an attempt to obtain testimony from the University's former ombudsperson, Ms. Hobson-Panico. The district court denied Ms. Miller's motions to the extent they required Ms. Hobson-Panico to answer questions precluded under the protective order or to reveal information protected by an "ombudsman privilege." An "ombudsman privilege," the district court held, protects communications made with an expectation of privacy to the University [*8] ombudsperson.

> n1 Early in the discovery process, Ms. Miller took the deposition of former University President Judith Albino. Portions of that deposition were leaked to the press which in turn generated several articles in area newspapers.

Defendants then filed a motion for summary judgment, which the district court granted on several grounds. First, the district court concluded the statute of limitations barred Ms. Miller's Title VII claims. In the alternative, the district court found Ms. Miller failed to establish she was a victim of actionable sexual harassment under Title VII. The court granted summary judgment on Ms. Miller's § 1983 claim because it was time barred, or, in the alternative, because Mr. Corbridge was entitled to qualified immunity. On appeal, Ms. Miller argues the district court erred by: (1) concluding she failed to establish a prima facie case under Title VII and § 1983; (2) concluding her claims were barred by the statute of limitations; (3) concluding Mr. Corbridge was entitled to qualified [*9] immunity; (4) upholding a protective order which improperly limited her discovery rights; (5)

limiting discovery pursuant to an ombudsman privilege; and (6) limiting her ability to conduct investigation of the case. We address each of these issues in turn.

II. Summary Judgment

A. Title VII Claims

The district court asserted two bases for granting summary judgment on the Title VII claims. First, the court determined Ms. Miller's claims were barred by the statute of limitations, and second, even if they were not, the evidence failed to establish either hostile work environment or *quid pro quo* sexual harassment. On appeal, Ms. Miller argues her claims are not barred by the statute of limitations under the continuing violation doctrine and, further, that she offered sufficient evidence to create a genuine fact dispute on both harassment claims.

We review the district court's grant of summary judgment de novo, applying the same legal standard as the district court. *Penry v. Federal Home Loan Bank, 155 F.3d 1257, 1261 (10th Cir. 1998), cert. denied, 143 L. Ed. 2d 498, 119 S. Ct. 1334 (1999).* We "examine the record to determine if any genuine [*10] issue of material fact was in dispute; if not, we determine if the substantive law was correctly applied." *Applied Genetics Int'l v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).* In applying this standard, we view the factual record and inferences therefrom in the light most favorable to the nonmoving party. *Tomsic v. State Farm Mut. Auto. Ins. Co., 85 F.3d 1472, 1476 (10th Cir. 1996).* However, to survive summary judgment, the nonmoving party may not rest upon the allegations or denials of his or her pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Panis v. Mission Hills Bank, 60 F.3d 1486, 1490 (10th Cir. 1995), cert. denied, 516 U.S. 1160, 134 L. Ed. 2d 192, 116 S. Ct. 1045 (1996).* Summary judgment is appropriate if a reasonable trier of fact could not return a verdict for the nonmoving party. *Penry, 155 F.3d at 1261.*

In Colorado, a Title VII claimant must file a charge of discrimination with the Equal Employment Opportunity Commission within 300 days after the alleged unlawful discriminatory practice occurred. n2 *42 U.S.C. § 2000e-5* [*11] (e)(1). This filing is a prerequisite to a civil suit under Title VII; *Martin v. Nannie & the Newborns, 3 F.3d 1410, 1414 (10th Cir. 1993),* and claims based on incidents occurring outside the 300-day limitations period are generally time-barred. *Mascheroni v. Board of Regents, 28 F.3d 1554, 1561-62 (10th Cir. 1994).* However, under the continuing violation doctrine, a plaintiff may recover for incidents which occurred outside the statutory time limit if at least one instance of the alleged discriminatory practice occurred within the limitations period and the earlier acts are part of a "continu-

ing pattern of discrimination." *Martin, 3 F.3d at 1415* (quotation marks and citation omitted). To determine whether alleged incidents of discrimination constitute a continuing violation we consider three factors:

> (i) subject matter - whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence - whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent [*12] to discriminate.

*Martin, 3 F.3d at 1415.* A plaintiff may not invoke the continuing violation doctrine by merely alleging that acts occurring outside the statutory time period had a continuing effect within the statutory period. *Id.* At the same time, the discriminatory act occurring within the time period "need not constitute a legally sufficient Title VII claim in itself." *Mascheroni, 28 F.3d at 1561.*

> n2 The 300-day filing period applies to "deferral states" in which the Equal Employment Opportunity Commission defers to the enforcement efforts of a state agency empowered to undertake employment discrimination investigations. *42 U.S.C. § 2000e-5*(e)(1). Otherwise, the filing period is 180 days. *Id.*

In this case, Ms. Miller filed a Charge of Discrimination with the Equal Employment Opportunity Commission on April 5, 1995. Subtracting 300 days from that date results in a limitations period starting June 10, 1994. Because the vast majority [*13] of Ms. Miller's allegations occurred outside of that limitations period, *i.e.*, before June 10, 1994, Ms. Miller attempts to invoke the continuing violation doctrine. To accomplish this, she must demonstrate that Mr. Corbridge engaged in a series of related discriminatory acts, at least one of which occurred *on or after* June 10, 1994. After a thorough review of the record, the district court determined Ms. Miller failed to identify a single discriminatory act occurring after June 10, 1994. The court therefore denied application of the continuing violation doctrine and concluded that Ms. Miller's Title VII claims were time barred. We agree.

As the district court noted, Ms. Miller's claims rest solely upon the alleged conduct of Mr. Corbridge. However, none of her allegations specify discriminatory conduct by Mr. Corbridge on or after June 10, 1994. In fact, the record indicates Mr. Corbridge resigned from the Chancellor's office effective August 1, 1994 and that he was out of the office on vacation for part of June and all of July 1994. *See Purrington v. University of Utah, 996 F.2d 1025, 1029 (10th Cir. 1993)* ("When the person harassing a plaintiff leaves [his] [*14] job, the harassment ends." (Internal quotation marks and citation omitted.)). Ms. Miller argues she "established violations which occurred as late as July or August, 1994." To support this assertion, Ms. Miller contends Mr. Corbridge "continued to be responsible" for her work environment until August 1, 1994. However, the continuing effect of conduct occurring outside the limitations period is insufficient to invoke the continuing violation doctrine. *Martin, 3 F.3d at 1415.*

Ms. Miller also claims that during the summer of 1994, Mr. Corbridge "utilized his power and influence to reward the compliant women ... and punish Miller" by not recommending her for a position with the incoming Chancellor and by reassigning some work duties to other employees. Neither of these allegations is sufficient to invoke the continuing violation doctrine. First, while it does appear Mr. Corbridge made personnel recommendations to the incoming Chancellor, we are not persuaded that Mr. Corbridge's recommendation (or lack thereof) amounts to a discriminatory act. The Equal Employment Opportunity Commission defines sexual harassment to include situations in which the plaintiff's submission [*15] to or rejection of sexual conduct is made a *term or condition of employment* or is used as the basis for an employment decision *affecting the individual* as well as conduct of a sexual nature that unreasonably interferes with the plaintiff's work environment. *29 C.F.R. § 1604.11(a)* (emphasis added). In this case, Mr. Corbridge's recommendation did not have an impact on Ms. Miller's work environment or any direct affect on Ms. Miller's employment status. In fact, the new Chancellor, Mr. Roderic Park, retained Ms. Miller despite Mr. Corbridge's allegedly unfavorable recommendation. In any event, it was *Mr. Park* who made the decisions affecting Ms. Miller's employment during his administration and Mr. Park's conduct is not at issue in this case. n3 While we recognize Ms. Miller need not demonstrate the commission of an act constituting a legally sufficient Title VII claim to invoke the continuing violation doctrine, she must at least identify a discriminatory act by Mr. Corbridge that impacted her employment in some manner. n4 *See Mascheroni, 28 F.3d at 1562.*

> n3 Ms. Miller originally included Mr. Park as a defendant in this suit but later voluntarily dismissed him. Ms. Miller admits Mr. Park never sexually harassed her.

Case 1:05-cv-01434-PLF    Document 9-4    Filed 09/23/2005    Page 23 of 29

Page 5

1999 U.S. App. LEXIS 16712, *; 1999 Colo. J. C.A.R. 4411

[*16]

n4 Even if Mr. Corbridge's personnel recommendation and reassignment of duties constituted discriminatory acts within the limitations period, those acts are not sufficient to invoke the continuing violation doctrine. *See Martin, 3 F.3d at 1415* (listing factors to be considered in assessing continuing violations). The alleged incidents of harassment were relatively infrequent over the six years of Ms. Miller's employment. More important, the nature of the alleged violations should have triggered Ms. Miller's awareness of the need to assert her rights. Ms. Miller testified that she believed the harassment began shortly after she started work in the Chancellor's office and that the early incidents influenced her perceptions of Mr. Corbridge and led her to believe that his later conduct was also motivated by discriminatory bias. In addition, the vast majority of her allegations center on events occurring between 1988 and 1993. Yet Ms. Miller waited until 1995 to file a complaint. Because Ms. Miller knew of the alleged discrimination as early as 1988, she had a duty to assert her rights at that time, and she may not now rely on the continuing violation doctrine to overcome the statutory filing requirements. *Martin, 3 F.3d at 1415 n.6* ("If an event or series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine to overcome the statutory requirement of filing a charge with the [Equal Employment Opportunity Commission] with respect to that event or series of events.").

[*17]

Second, we find no factual support for Ms. Miller's allegations regarding Mr. Corbridge's job duty reassignment in the summer of 1994. Ms. Miller testified Mr. Corbridge reassigned some of her job duties to Ms. White when Ms. White returned to the Chancellor's office after attending law school. Ms. White returned to the Chancellor's office on a full time basis in 1993 - well before June 10, 1994. Ms. Miller also claims her job duties changed during the transition period between Mr. Corbridge and Mr. Park. However, the record shows Mr. Park was responsible for the personnel decisions affecting his term of office, and we find no evidence that Mr. Corbridge reassigned any duties in the summer of 1994.

In sum, we conclude Ms. Miller has failed to allege at least one discriminatory act occurring within the 300-

day limitation period and, as such, she cannot invoke the continuing violation doctrine to preserve her claims. Thus, the district court appropriately determined that Ms. Miller's Title VII claims are time-barred. n5 *See Mascheroni, 28 F.3d at 1562* (concluding the statute of limitations barred plaintiff's Title VII claims because he failed to allege at least one [*18] discriminatory act occurring within the limitation period).

n5 We agree with the district court's conclusion that Ms. Miller has not presented circumstances under which she is entitled to equitable tolling of the limitations period.

Ms. Miller also contends the district court erred in granting the University's motion for summary judgment based on her failure to present sufficient evidence of a hostile work environment or *quid pro quo* sexual harassment. Ms. Miller argues she presented enough evidence to create a genuine issue of material fact on both claims. We disagree. n6

n6 Although the statute of limitations bar is a sufficient basis upon which to affirm the district court's ruling, we nevertheless address the court's alternative analysis because it is crucial to other issues in this case.

To survive summary judgment on her *quid* [*19] *pro quo* claim, Ms. Miller must show that a reasonable jury could find Mr. Corbridge conditioned concrete employment benefits on her submission to sexual conduct. *Martin, 3 F.3d at 1416.* "The gravamen of a quid pro quo sexual harassment claim is that tangible job benefits are conditioned on an employee's submission to conduct of a sexual nature and that adverse job consequences result from the employee's refusal to submit to the conduct." *Hicks v. Gates Rubber Co., 833 F.2d 1406, 1414 (10th Cir. 1987).* Ms. Miller admits Mr. Corbridge never made overt requests for sexual favors. Instead, Ms. Miller contends Mr. Corbridge "punished" her for rebuffing his sexual advances by taking tangible job benefits from her while at the same time rewarding more "compliant" women with job benefits. The tangible job benefits Mr. Corbridge allegedly took from Ms. Miller include: (1) job duties, (2) an employment recommendation to the new Chancellor, and (3) ultimately her job because Mr. Corbridge's conduct caused a mental break down which in turn forced her to quit. n7 None of these allegations is sufficient to create a genuine issue of material fact regarding specific [*20] adverse job consequences Ms. Miller suffered.

Case 1:05-cv-01434-PLF    Document 9-4    Filed 09/23/2005    Page 24 of 29

Page 6

1999 U.S. App. LEXIS 16712, *; 1999 Colo. J. C.A.R. 4411

n7 In her brief, Ms. Miller implies that Mr. Corbridge yelled at and humiliated her because she refused his sexual overtures. We agree with the district court that such conduct does not amount to the denial of a "concrete employment benefit" and cannot form the basis of a *quid pro quo* claim. *Martin, 3 F.3d at 1416.*

First, although the record is somewhat unclear, it appears Ms. Miller's job duties were altered on two occasions. In 1993, Ms. Miller claims Mr. Corbridge assigned some of her duties to Ms. White when Ms. White returned to the Chancellor's office after attending law school. However, as Ms. Miller admits, Ms. White performed those duties before she went to law school, and Mr. Corbridge merely restored them to Ms. White when she returned. Ms. Miller cannot lose tangible job benefits that were never hers to begin with. n8

n8 Ms. Miller admits her allegations regarding the loss of tangible job benefits prior to August 1994 are "very weak" since prior to that date "what Jennifer Miller had lost in terms of a concrete benefit was admittedly marginal."

[*21]

Ms. Miller makes much of the fact that Mr. Corbridge and Ms. White were allegedly having an affair at the time. However, their consensual romantic involvement, if any, is of no consequence. n9 Title VII does not prohibit favoritism shown to a supervisor's paramour because such preferential treatment is based on voluntary romantic affiliation and not gender differences. *See Taken v. Oklahoma Corp. Comm'n, 125 F.3d 1366, 1370 (10th Cir. 1997)* (concluding plaintiff's allegations that defendant supervisor preselected his paramour for a promotion did not state an actionable Title VII claim because allegations were based on voluntary romantic affiliation and not gender differences). Thus, even assuming Mr. Corbridge and Ms. White were romantically involved and that Mr. Corbridge favored Ms. White in some manner, such favoritism would not present an actionable *quid pro quo* claim.

n9 Both Ms. White and Mr. Corbridge deny any such involvement.

The second reassignment of duties allegedly occurred [*22] during the transition from Chancellor Corbridge to interim Chancellor Roderic Park. However, the record shows Mr. Corbridge merely made recommendations to the incoming Chancellor and that Mr. Park was responsible for the personnel decisions affecting his term of office. Ms. Miller admits Mr. Park did not discriminate against her and, therefore, she cannot base her *quid pro quo* claim on his decisions.

We also conclude Mr. Corbridge's employment recommendation to Mr. Park and Ms. Miller's resignation from the University are not denials of "concrete employment benefits." Mr. Corbridge's recommendation to Mr. Park was just that - a recommendation. Mr. Park was free to act on that recommendation or not. Regardless, the recommendation itself had no direct, tangible impact on Ms. Miller's job. *Cf. Sanders v. Casa View Baptist Church, 134 F.3d 331, 338* (5th Cir.) (affirming summary judgment against plaintiffs on their *quid pro quo* claim where evidence revealed that defendant's alleged conduct had no tangible affect on plaintiffs' jobs), *cert. denied, 119 S. Ct. 161 (1998)*. Rather, it is Mr. Park's actions that impacted Ms. Miller's job duties and, [*23] as we stated above, Mr. Park's actions cannot serve as a basis for Ms. Miller's *quid pro quo* claim. Likewise, Ms. Miller cannot transform her decision to resign into the loss of a concrete employment benefit by alleging Mr. Corbridge caused her to quit. Mr. Corbridge no longer worked in the Chancellor's office when Ms Miller resigned and it was therefore impossible for him to condition her continued employment on submission to sexual conduct. Thus, Ms. Miller has failed to present sufficient evidence that she suffered a tangible, adverse job consequence as a result of her failure to submit to unwelcome sexual advances. For these reasons, the district court did not err in granting summary judgment on her *quid pro quo* claim.

We next consider Ms. Miller's hostile work environment claim. A hostile work environment occurs when unwelcome sexual conduct unreasonably interferes with an employee's performance or creates an intimidating, hostile, or offensive work environment. *Smith v. Northwest Fin. Acceptance, Inc., 129 F.3d 1408, 1412 (10th Cir. 1997)* (quoting *Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986))*. [*24] To survive summary judgment, Ms. Miller must show that a rational jury could find the harassment so severe or pervasive as to alter the conditions of the her employment and create an abusive working environment. *Smith, 129 F.3d at 1412.* The conduct must be both objectively and subjectively abusive. *Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1071 (10th Cir. 1998)*. Ms. Miller must also produce evidence that "the conduct at issue was not merely tinged with offensive sexual connotations but actually constituted discrimination because of sex." *Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 1002,*

Case 1:05-cv-01434-PLF    Document 9-4    Filed 09/23/2005    Page 25 of 29

Page 7

1999 U.S. App. LEXIS 16712, *; 1999 Colo. J. C.A.R. 4411

*140 L. Ed. 2d 201 (1998)* (internal quotation marks omitted). To determine whether an environment is hostile or abusive, we examine the totality of the circumstances including factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993).* [*25] Conduct which merely engenders offensive feelings or amounts to normal job stress does not violate Title VII. *See Smith, 129 F.3d at 1412; Trujillo v. University of Colo. Health Sciences Ctr., 157 F.3d 1211, 1214 (10th Cir. 1998).*

Ms. Miller fails to make the required showing. As the district court noted, many of Ms. Miller's allegations center on incidents she was not aware of during her employment. However, to establish a genuine issue of material fact as to whether she was subject to a hostile work environment, Ms. Miller may rely only on conduct she was aware of during her employment. *Hirase-Doi v. U.S. West Communications, Inc., 61 F.3d 777, 782 (10th Cir. 1995).* Considering only that evidence, we are unable to conclude that a rational jury could find the alleged harassment severe or pervasive enough to constitute an objectively hostile work environment. As Ms. Miller admits, her allegations contain none of the "hallmarks" of a sexually hostile work environment claim such as overt requests for sexual favors, lewd remarks or sexual comments about her body or clothing, jokes of a sexual nature, or display of sexually oriented [*26] materials. *Trujillo, 157 F.3d at 1214* (concluding plaintiff failed to establish a racially hostile work environment where there was no evidence of physically threatening or humiliating activity, racial slurs, or ridicule). The unwelcome touching and leering directed at Ms. Miller was relatively infrequent and completely ceased by the fall of 1993. *See Penry, 155 F.3d at 1263* (concluding gender-based incidents occurring sporadically over a three year period were insufficient to establish a hostile work environment). Moreover, the touching was relatively mild in character - it did not involve intimate body parts, nor was it physically threatening. *See, e.g., Adusumilli v. City of Chicago, 164 F.3d 353, 361 (7th Cir. 1998)* (concluding incidents during which a co-worker allegedly touched plaintiff's arm, fingers, and buttocks were too mild and infrequent to establish a hostile work environment). In fact, many of Ms. Miller's co-workers testified that while Mr. Corbridge had a "friendly" style and frequently touched male and female employees during conversations, his touching was neither sexual nor offensive. Mr. Corbridge's alleged touching [*27] of other women, including Ms. Branigan and Ms. Hobson-Panico, is likewise too infrequent and mild in character to establish a hostile work environment.

n10 Because the severity-pervasiveness standard is an inquiry aimed at establishing whether *the plaintiff* experienced an abusive environment, we consider only that conduct *the plaintiff* was aware of during the time at issue. *See Hirase-Doi v. U.S. West Communications, Inc., 61 F.3d 777, 782 (10th Cir. 1995).* This is true whether we are evaluating the evidence from the plaintiff's subjective viewpoint or a reasonable person's objective viewpoint. Either way the focus remains on the conduct experienced by the plaintiff. *See, e.g., Smith, 129 F.3d at 1413-14* (examining plaintiff's work environment from a subjective and objective point of view).

Ms. Miller's other allegations also lack the severity or pervasiveness necessary to establish a work environment "permeated with discriminatory intimidation, ridicule and insult." [*28] *Smith, 129 F.3d at 1414* (internal quotation marks and citation omitted). Mr. Corbridge's invitations to attend University social gatherings and after work drinks were infrequent and confined to the first few months of Ms. Miller's tenure in the Chancellor's office. The fact that Mr. Corbridge directed Ms. Miller to arrange phone calls and meetings is also not indicative of a hostile work environment. It was Ms. Miller's job to place phone calls and arrange meetings for the Chancellor, and we fail to see how directing an employee to perform regular job duties amounts to harassment. Ms. Miller claims she was forced to "enable [Mr. Corbridge] in his romantic endeavors," and testified "it was offensive that I would have to arrange his social life ... That wasn't in my job description. That wasn't something I felt that I should have to do." Yet, Ms. Miller admits she never witnessed any of the calls or meetings, and we find no evidence that she was in any way subject to their content, romantic or otherwise. Her unsupported speculation about what did occur does not transform the Chancellor's request that she perform her regular job duties into evidence of a hostile [*29] or abusive work environment.

Viewing the totality of the circumstances, including the general work atmosphere and the specific conduct directed at Ms. Miller and others, we find insufficient evidence of either severe or pervasive harassment. As the district court noted, Ms. Miller's evidence shows nothing more than her subjective opinion that Mr. Corbridge's behavior was inappropriate for a boss. Such opinions are not actionable under Title VII. The district court correctly granted summary judgment on the hostile work environment claim.

B. § 1983 Claim.

1999 U.S. App. LEXIS 16712, *; 1999 Colo. J. C.A.R. 4411

In granting Mr. Corbridge's motion for summary judgment on Ms. Miller's § 1983 claim, the district court again asserted two bases for its decision. The court concluded Mr. Corbridge was entitled to qualified immunity or, in the alternative, that the claim was barred by the relevant statute of limitations. After reviewing the district court's grant of summary judgment de novo and applying the same legal standard as the district court, *Penry, 155 F.3d at 1261*, we conclude the district court properly determined that Mr. Corbridge is entitled to qualified immunity.

Qualified immunity shields government officials [*30] performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutionality rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982)*. Before reaching the qualified immunity issue, however, we must first determine whether Ms. Miller's allegations, if accepted as true, state a claim for violation of any rights secured under the Constitution. *Abeyta v. Chama Valley Indep. Schl. Dist., 77 F.3d 1253, 1255 (10th Cir. 1996)*. We will not reach the qualified immunity issue if Ms. Miller's claims are not actionable. *Abeyta, 77 F.3d at 1255*. Ms. Miller has the burden to "show with particularity facts and law establishing the inference that defendant violated a constitutional right." *Id.* (quotation marks and citation omitted). "More is required to state a claim for a constitutional violation ... than for a statutory claim under Title VII." *Id. at 1256*.

Ms. Miller claims Mr. Corbridge violated the Equal Protection Clause by committing both *quid pro quo* and [*31] hostile work environment sexual harassment. However, as discussed above, Ms. Miller's evidence does not sufficiently demonstrate that Mr. Corbridge committed actionable harassment under Title VII. Because she cannot demonstrate that Mr. Corbridge's conduct violated Title VII, her constitutional claim based on the same conduct fails as well. *See id.* Thus, the district court did not err in granting summary judgment on Ms. Miller's § 1983 claims.

III. Discovery Limitations

In relevant part, the protective order limited discovery by: (1) prohibiting deposition questions based on rumor and innuendo; (2) requiring deponents to identify where or from whom they obtained the information testified to, when they obtained the information, and the nature of the information; (3) limiting discovery concerning Mr. Corbridge's alleged improprieties to employees of the Chancellor's office and employees over whom Mr. Corbridge had direct supervision; and (4) limiting discovery to the time frame of Ms. Miller's employment in the Chancellor's office. The district court also made discovery rulings that prohibited Ms. Miller from questioning witnesses about Mr. Corbridge's inappropriate conduct if [*32] the conduct occurred outside the office, and if Ms. Miller was unaware of it during her employment. The court offered two primary bases for imposing these discovery limitations: (1) the excluded information was not relevant to Ms. Miller's claims, and (2) the limitations served to protect both parties and non-parties from annoyance, embarrassment, intimidation and oppression. Ms. Miller argues the court improperly limited her ability to discover relevant information about Mr. Corbridge's alleged improper sexual conduct. She contends such information is relevant to establish the "nuances" of her hostile work environment, to prove motive and discriminatory intent, as well as the University's vicarious liability for Mr. Corbridge's actions. In addition, Ms. Miller claims the district court mischaracterized relevant evidence about Mr. Corbridge's conduct as rumor and innuendo.

We review the district court's discovery order for abuse of discretion. *Gomez v. Martin Marietta Corp., 50 F.3d 1511, 1520 (10th Cir. 1995)*. We will not disturb the trial court's ruling "absent a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds [*33] of permissible choice in the circumstances." *Kidd v. Taos Ski Valley, Inc., 88 F.3d 848, 853 (10th Cir. 1996)* (internal quotation marks and citation omitted). A court abuses its discretion if its ruling is arbitrary, capricious, whimsical, or manifestly unreasonable. *Coletti v. Cudd Pressure Control, 165 F.3d 767, 777 (10th Cir. 1999)*. An erroneous discovery ruling will not lead to reversal unless the error affected the substantial rights of the parties. *Frontier Ref., Inc. v. Gorman-Rupp Co., Inc., 136 F.3d 695, 705 (10th Cir. 1998)*.

We agree with the district court that it has wide discretion to limit the scope of discovery based on the rights and needs of the parties. *See Gomez, 50 F.3d at 1520*. Specifically, the federal rules give district courts the power to limit discovery if "the burden or expense of the proposed discovery outweighs its likely benefit." *Fed. R. Civ. P. 26 (b)(2)(iii)*. District courts may also issue a protective order if "justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *Fed. R. Civ. P. 26(c)*. The district court is in the best [*34] position to weigh these variables and determine the appropriate limits because, unlike an appellate court, the district court has the ability to view firsthand the progression of the case, the litigants, and the impact of discovery on parties and nonparties. *Cf. Moothart v. Bell, 21 F.3d 1499, 1504 (10th Cir. 1994)* (concluding that the abuse of discretion standard is appropriate in reviewing a trial court's evidentiary rulings

Case 1:05-cv-01434-PLF    Document 9-4    Filed 09/23/2005    Page 27 of 29

Page 9

1999 U.S. App. LEXIS 16712, *; 1999 Colo. J. C.A.R. 4411

because the trial court has the firsthand ability to view the witness or evidence and assess credibility and probative value).

In this case, the district court weighed the significant burdens Ms. Miller's proposed discovery would place on both parties and non-parties against the potential relevance of the information sought, concluded the burdens outweighed the benefits, and imposed limitations accordingly. We agree that much of the information excluded, including reports of conduct based on rumors and innuendo, and other women's experiences that were remote in time and attenuated from Ms. Miller's experiences, has limited relevance to Ms. Miller's claims. *See Hirase-Doi, 61 F.3d at 782* (concluding plaintiff may only rely on [*35] evidence of conduct she was aware of to prove the existence of a hostile work environment). We also agree that inquiries into such conduct could and did unduly harass, intimidate and disparage parties and non-parties to this case. Furthermore, we note the district court allowed Ms. Miller significant discovery regarding people and events that did directly affect her employment and work environment. n11 *See Gomez, 50 F.3d at 1520* (concluding the district court did not abuse its discretion in limiting discovery in Title VII case were plaintiff was provided abundant discovery).

n11 We find no merit in Ms. Miller's argument that the district court erroneously prohibited her from interviewing witnesses on Ms. Albino's "list." The list contains names of women that Ms. Albino claims might have suffered sexual harassment on the Boulder campus. The only names the district court refused to reveal where those of women who alleged complaints Ms. Albino heard of through the campus "rumor mill." We find no abuse of discretion in that decision. The remaining names Ms. Miller already knew, Ms. Albino could not identify, or the court allowed to be revealed. Ms. Miller was free to interview those remaining women. The district court merely cautioned her to make sure the testimony would be useful before interviewing them.

Ms. Miller also claims the court erroneously prevented her from having ex parte communications with former Chancellors of the University. However, Ms. Miller failed to cite to or include a transcript of the district court's oral ruling. We therefore decline to review the issue. *See McGinnis v. Gustafson, 978 F.2d 1199, 1201 (10th Cir. 1992)* (refusing to review issue because appellant's failure to include transcript of the district court's oral ruling "raises an effective barrier to informed, substantive appellate re-

view."); *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1540 n.3 (10th Cir.), cert. denied, 519 U.S. 928, 136 L. Ed. 2d 216, 117 S. Ct. 297 (1996)* ("We may refuse to review alleged error if the party seeking review fails to include and reference the portion of the record wherein their objection and the district court's ruling thereon may be found." (Internal quotation marks and citation omitted.)).

[*36]

However, we must address some concerns we have with the district court's analysis regarding relevancy. Under the federal rules, a party may obtain discovery of "any matter, not privileged, which is relevant to the subject matter involved in the pending action." *Fed. R. Civ. P. 26(b)(1).* Of course, information need not be admissible to be considered relevant for discovery purposes. Rather the information sought must "appear[] reasonably calculated to lead to the discovery of admissible evidence." *Id.* In its analysis, the court seems to imply that all evidence regarding Mr. Corbridge's conduct toward other women which Ms. Miller was unaware of during her employment was irrelevant to Ms. Miller's Title VII claims. While we agree the evidence has limited value to Ms. Miller in this case, such evidence is not totally irrelevant to a harassment claim under Title VII.

For example, in a hostile work environment claim, a plaintiff must show (1) that the harassment was severe or pervasive enough to alter the terms, conditions or privilege of employment and (2) that the harassment stemmed from discriminatory animus. *Trujillo, 157 F.3d at 1214.* We have previously held [*37] that a plaintiff may not rely on evidence of conduct he or she was unaware of to establish element number one - the severity and pervasiveness of the harassment. *See Hirase-Doi, 61 F.3d at 782; Creamer v. Laidlaw Transit, Inc., 86 F.3d 167, 171 (10th Cir.), cert. denied, 519 U.S. 983, 136 L. Ed. 2d 335, 117 S. Ct. 437 (1996).* However that evidence may be relevant to establishing element number two - discriminatory intent. *See Spulak v. K Mart Corp., 894 F.2d 1150, 1156 (10th Cir. 1990)* (holding that testimony of other employees about their treatment by the defendant is relevant to the issue of discriminatory intent). The relevance of such testimony is not affected by the plaintiff's knowledge of conduct because it is offered to show the defendant's state of mind rather than the plaintiff's experiences in the workplace. *See Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 110-11 (3d Cir. 1999)* (concluding evidence of defendant supervisor's harassment of other women was relevant to show motive in plaintiff's hostile work environment claim even though plaintiff had no personal knowledge of the events). [*38] Of course, the court may exclude such testimony if the wit-

Case 1:05-cv-01434-PLF    Document 9-4    Filed 09/23/2005    Page 28 of 29

Page 10

1999 U.S. App. LEXIS 16712, *; 1999 Colo. J. C.A.R. 4411

ness' statements have no logical or reasonable connection to the plaintiff's circumstances. *See Curtis v. Oklahoma City Pub. Schl. Bd. of Educ., 147 F.3d 1200, 1217 (10th Cir. 1998).*

Conduct the plaintiff was unaware of might also be relevant to prove an employer's liability for sexual harassment by one of its employees. There are three bases for holding an employer liable under Title VII: (1) if the employee's conduct occurred within the scope of his employment, (2) if the employer knew or should have known about the employee's conduct and failed to respond in a reasonable manner, and (3) if the employee acted with apparent authority. *See Wright-Simmons v. City of Okla. City, 155 F.3d 1264, 1269-70 (10th Cir. 1998).* Evidence of a supervisor's harassment of other women may be relevant to establish employer liability under the second basis, even if the plaintiff was unaware of it, so long as the harassment was similar in nature and close in time to plaintiff's experiences. *Hirase-Doi, 61 F.3d at 783-84; see also Hurley, 174 F.3d at 111* (concluding evidence of [*39] other acts of harassment and widespread sexism is probative of whether defendant employer knew or should have known that sexual harassment was occurring, regardless of whether plaintiff employee had knowledge of the incidents). In addition, a supervisor's conduct may be relevant under the third basis, to rebut the employer's affirmative defense that it exercised reasonable care to prevent and correct the supervisor's behavior. *See Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662 (1998)* (discussing the apparent authority basis for employer liability and the affirmative defense available to employers if no tangible employment action is taken).

Thus, evidence of the defendant's conduct which the plaintiff was unaware of at the time is not *a priori* irrelevant to a hostile work environment claim. Nonetheless, we find the district court's failure to consider the potential relevance of such evidence in this case to be harmless error. None of the information the district court excluded would have saved Ms. Miller's claims from summary judgment. As we discussed above, the court properly determined that Ms. Miller failed to sufficiently [*40] demonstrate harassment severe or pervasive enough to constitute a hostile work environment. The only evidence Ms. Miller could have used to make this showing was conduct she was aware of during her employment. *See Hirase-Doi, 61 F.3d at 782.* Information about Mr. Corbridge's conduct outside Ms. Miller's work environment and conduct she was unaware of at the time would not have created a genuine fact issue regarding the severity and pervasiveness of the alleged harassment. n12 The same is true for her *quid pro quo* claim. The district court granted summary judgment on that claim because Ms. Miller failed to identify a tangible job bene-

fit. None of the excluded information pertains to Ms. Miller's employment or the specific job benefits she allegedly lost. Thus, we cannot say that the district court's ruling, even if erroneous, affected the substantial rights of the parties or precluded a fair trial. As such, we find no abuse of discretion warranting reversal. *See Frontier Refin., 136 F.3d at 705* (concluding that an erroneous discovery ruling requires reversal only if it affected the substantial rights of the parties); *Gaines v. Ski Apache, 8 F.3d 726, 730 (10th Cir 1993)* [*41] ("The trial court has broad discretion regarding its control of discovery, and we will find that discretion to have been abused only when a denial of discovery precludes a fair trial." (Internal quotation marks and citation omitted.); *Miller v. United States, 710 F.2d 656, 666 (10th Cir.)* (concluding trial court made no prejudicial error in limiting discovery where there were no facts plaintiffs could have developed to avoid dismissal of their claims), *cert. denied, 464 U.S. 939, 78 L. Ed. 2d 316, 104 S. Ct. 352 (1983).*

> n12 We recognize that Ms. Miller could have used that evidence to prove Mr. Corbridge's discriminatory intent. However, proof of motive or lack thereof was not a key issue in the district court's decision. Moreover, evidence of motive would not change the ultimate outcome in this case because, even if we assume that all of the conduct Ms. Miller witnessed was in fact motivated by discriminatory intent, we are still unable to conclude that a rational jury could find that conduct sufficiently severe or pervasive. *Cf. Penry, 155 F.3d at 1263* (concluding plaintiff's evidence, including both gender-motivated conduct and conduct that merely had gender-related implications, was insufficient to defeat summary judgment of her hostile work environment claim).

[*42]

For the same reason, we affirm the district court's ruling regarding the ombudsman privilege. It is clear that neither Colorado law nor federal law, including the decisions of this circuit, recognize an ombudsman privilege. Other federal courts have gone both ways on the issue. *Compare Carman v. McDonnell Douglas Corp., 114 F.3d 790, 793-94 (8th Cir. 1997)* (concluding complaints registered with a corporate ombudsman office were not privileged) *with Shabazz v. Scurr, 662 F. Supp. 90, 92 (S.D. Iowa 1987)* (concluding communications received by prison ombudsman were privileged). We find it unnecessary to address the issue here because the district court's ruling does not affect the substantial rights of the parties. The information precluded under the privilege concerns other employees' work experiences and other employee's complaints of discriminatory conduct. It does

Case 1:05-cv-01434-PLF     Document 9-4     Filed 09/23/2005     Page 29 of 29

Page 11

1999 U.S. App. LEXIS 16712, *; 1999 Colo. J. C.A.R. 4411

not relate to the work environment Ms. Miller experienced nor the tangible job benefits she lost and, therefore, could not have saved her Title VII or § 1983 claims from summary judgment.

Accordingly, we **AFFIRM** the district court's discovery rulings and order granting summary judgment [*43] in favor of the University and Mr. Corbridge.

**Entered by the Court:**

**WADE BRORBY**

United States Circuit Judge